# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of

J.T.R. DOB: 3/22/07
J.J.R. DOB: 09/2/05


STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES,

              Respondent,

      v.

ABIGAIL ROCCO,
              Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 74624-3-I
(consolidated with No.
74625-1-I)

DIVISION ONE

UNPUBLISHED OPINION

FILED: November 14, 2016

APPELWICK, J. — appeals the order terminating her parental rights to her sons

J.J.R. and J.T.R. She contends the Department failed to prove that (1) all necessary

and available services capable of correcting her parental deficiencies were provided;

(2) there was little likelihood that her parental deficiencies could be remedied in the

near future; and (3) that termination was in the best interest of the children. Rocco

also argues that the juvenile court violated her due process rights by failing to provide

adequate notice of an alleged parental deficiency. Substantial evidence supports the

relevant findings, and Rocco fails to demonstrate a due process violation. We affirm.

FACTS

Abigail Rocco is the mother of J.J.R. (born 9-2-2005) and J.T.R. (born 3-22-2007). J.J.R. suffers from epilepsy and is currently enrolled in special education classes.[1]

J.J.R. and J.T.R. lived with Rocco until November 2013. Between 2008 and 2012, the Department of Social and Health Services (Department) received several Child Protective Services (CPS) referrals regarding Rocco's possible drug use, negligent treatment of the children, and the presence of unsafe individuals in the home. In several instances, the Department intervened temporarily and provided voluntary family preservation services.

In the fall 2013, Rocco and the children moved from Arlington to Seattle and lived with Terrance Maynard, Rocco's boyfriend. On November 5, 2013, the Department investigated a report that J.J.R. and J.T.R. had missed a week of school. The mother explained that J.J.R. received two black eyes when he fell following a seizure. Rocco asked the school not to contact CPS.

When J.J.R. returned to school, school employees noticed that he had a healing abrasion on his left cheek and redness in his left eye. When asked how it happened, J.J.R. responded "Terrence" and gestured that Maynard had punched him in the face. J.T.R. told Department social workers that both Rocco and Maynard hit the children with a belt. He confirmed that when he says "dad," he means Maynard.

---

[1] The court's decisions terminating the parental rights of J.J.R.'s and J.T.R.'s fathers are not at issue in this appeal.

J.T.R. also said that Rocco and Maynard told him not to talk about what goes on at home because it is "their business." J.T.R. made similar disclosures to a nurse at Swedish Medical Center.

Rocco maintained that J.J.R. and J.T.R. were lying and denied that she or Maynard used physical discipline. She claimed that she had separated from Maynard and had no further relationship with him.

The Department removed J.J.R. and J.T.R. from Rocco's care. On January 10, 2014, Rocco stipulated to the entry of a dependency order. Among other things, the disposition order required Rocco to complete random urinalysis testing (UA). Because of Rocco's history of trauma and sexual abuse as a child, the court ordered her to complete a psychological evaluation with parenting component and follow any mental health and parenting treatment recommendations. Rocco successfully completed the UA testing.

Social worker Ashley Shelby initially referred Rocco to Dr. Tatyana Shepel for a psychological and parenting assessment. Rocco eventually canceled the appointment, which was scheduled for June 2014. Because Dr. Shepel was not available for a new appointment within a reasonable time, Shelby referred Rocco to Dr. Steve Tutty.

Rocco met with Dr. Tutty several times for the evaluation between August 11 and October 8, 2104. Tutty also observed one of Rocco's visits with J.J.R. and J.T.R.

Based on a variety of tests, Tutty diagnosed Rocco with posttraumatic stress disorder (PTSD), consistent with the abusive history that Rocco experienced until she was 14. Tutty also noted a "rule out" for paranoid personality traits, requiring further information to diagnose.

Tutty found that Rocco had adequate cognitive and executive functioning and that J.J.R. and J.T.R. were closely bonded with her. He concluded, however, that Rocco did not appear to be amenable to services in light of her CPS history and paranoia personality assessment inventory. As a result, she likely lacked sufficient insight into her psychological challenges and currently posed a moderate risk for failing to protect the safety and best interests of the children. Tutty believed that Rocco required a "significant amount of structure and oversight to engage and complete treatment services."

Tutty recommended that Rocco complete counseling sessions with a therapist skilled in trauma-focused cognitive behavioral treatment (TF-CBT). In addition, he recommended that Rocco schedule an appointment with a medication provider for assessment of psychotropic medications to reduce her levels of paranoia and vigilance. Tutty believed that Rocco would benefit from a specialized parenting class.

Tutty completed his evaluation on October 16, 2014, and submitted it to the Department. Dependency review orders entered in December 2014 and early February 2015 expressly included Tutty's recommendations for trauma-focused cognitive behavioral therapy and the assessment of psychotropic medication as

-4-

additional court ordered services. The record does not explain the Department's failure to provide the evaluation to Rocco or to discuss it with her before February.

Melissa Hoogendoorn, the assigned social worker from October 2014 to April 2015, discussed Tutty's recommendations with Rocco by phone in February 2015. Hoogendoorn and Rocco initially considered Sound Mental Health for the services, but then agreed that Community Psychiatric Clinic (CPC) would be more convenient for Rocco for the counseling and medication assessment.

Hoogendoorn met with Rocco at the Department office on March 17, 2015, and again discussed Tutty's recommendations. Hoogendoorn handed Rocco a service letter summarizing Tutty's recommendations, including TF-CBT and medication management, and including contact information for CPC.

Rocco told Hoogendoorn that she had "gone to an agency at some point" and was told that she did not need therapy. When Hoogendoorn learned that Rocco had apparently not mentioned Tutty's evaluation and recommendation to the agency, she advised Rocco to sign a release of information so that the Department could provide Tutty's evaluation:

> We again talked about the recommendations from Dr. Tutty's evaluation. We talked about going to Community Psychiatric Clinic for the trauma-focused CBT and being evaluated for medication there. We talked about how it would be important for Ms. Rocco to sign a release of information so that I could make—so that I or her social worker could make sure that CPC had a copy of the evaluation from Dr. Tutty so that there would be clear information as to what the Department's concerns were regarding her mental health. And, we talked a little bit about her trauma past and how that was impacting her decision as to whether or not to engage in services.

Rocco informed Hoogendoorn that she was not going to participate in TF-CBT therapy because she "felt like all she would be doing is talking about her past and the sexual abuse" and believed that "she was already past that." Rocco became increasingly upset and began screaming. She insisted that she was not going to participate in TF-CBT, accused Hoogendoorn of ignoring the abuse that J.J.R. and J.T.R. were experiencing in their foster home, and stormed out of the building.

Cecilie Han replaced Hoogendoorn as the children's social worker in April 2015. Han arranged for Rocco to participate in the required specialized parenting course, which Rocco successfully completed. Han also discussed the court ordered mental health and medication services with Rocco, who indicated that she did not need the services because she had participated in mental health therapy as a child.

But, when Rocco indicated that she had been denied counseling services, Han contacted CPC. Han learned that CPC had denied services because Rocco did not endorse any mental health symptoms. In June 2015, after Han provided a copy of Tutty's evaluation and additional information, CPC agreed to offer services if Rocco demonstrated a willingness to engage. Office of Public Defense social worker Alise Hegle also assisted Rocco and encouraged her to participate in the court ordered therapy.

In July 2015, Rocco participated in an intake appointment, and CPC accepted her for services. The CPC diagnosis for Rocco was major depressive disorder.

On August 21, 2015, Rocco told Jessica Blanche, the court appointed special advocate (CASA), that her children were in dependency because the nurses at their

school lied and falsely accused her and Maynard of abuse. Rocco told Blanche that she had been denied counseling and did not need counseling or mental health treatment of any kind.

In mid-September 2015, Rocco began counseling sessions with Emily Miller, a licensed therapist at CPC. As part of the treatment plan, Rocco identified her goals as "getting a driver's license, continuing with school, and getting custody of her children back."

Han met with Rocco at a shared planning meeting on September 29, 2015. At the meeting, Rocco appeared to agree to participate in both TF-CBT and the medication assessment. In a subsequent series of e-mails, however, Rocco questioned whether she needed a medication evaluation.

Han testified that Rocco had not made progress in correcting the primary parental deficiency that led to the removal of J.J.R. and J.T.R.:

> it concerns me that Ms. Rocco does not believe that she does need mental health services. I believe that it—a significant piece to making progress in mental health therapy is self-awareness and understanding that some sort of change needs to take place, or willingness for a change to take place. And I don't feel that—I don't feel like that's something that's present here in this case. I feel like in assessing through, kind of, all the case history, and my interactions with Ms. Rocco, I feel that her mental health has really impacted her children and put them at risk.

The Department petitioned for termination of Rocco's parental rights on June 22, 2015. At the time of the termination trial, which began on October 27, 2015, Rocco had completed five sessions with Miller. Rocco also stated that she had signed up for a trauma-based group session in November 2015.

Miller testified that she had "begun discussing" TF-CBT with Miller and had started the "psychoeducation" module in the last session. Miller explained that the psychoeducation module involved addressing "risk factors that make a person vulnerable to certain types of trauma." The safety planning module of TF-CBT, which seeks to minimize those risk factors, is usually done as one of the last modules. Miller acknowledged that TF-CBT therapy could take up to a year and anticipated working with Rocco for a year. Miller testified that Rocco was aware of the process for arranging the medication assessment, but she informed Miller "that she is not interested in medication management at the moment."

Rocco testified extensively over the course of the four day trial. She claimed that she had long wondered why the Department removed J.J.R. and J.T.R. from her care and always got a "runaround" when she tried to find out. Rocco repeatedly denied she needed therapy to address trauma because she completed that therapy when she was young. Rocco now planned to complete the therapy so that she could regain custody of J.J.R. and J.T.R.

Rocco claimed that Maynard had never physically abused the children and that J.J.R. and J.T.R. were lying. She remained reluctant, however, to address why the children would repeat such lies. At one point, she asserted the police had coerced the children into making the allegations. When the court pressed her for an explanation, Rocco suggested that the children were angry with her after they were wrongfully evicted from their Arlington apartment.

Rocco acknowledged that she lived in Maynard's apartment from around November 2013 to November 2014, but denied having any current relationship him. Rocco agreed that the Department could conduct a surprise visit to her home, "as long as it's not on the weekends." The Department presented evidence that Maynard's benefit checks were being sent to her current address and that Maynard had provided the Department with Rocco's address.

Rocco denied that she delayed complying with the court-ordered counseling and medication requirements. She asserted that when she first contacted CPC in February 2015, the interviewer determined that she did not qualify for counseling, even though she showed the intake assessor Tutty's evaluation and disclosed her history of abuse. Rocco claimed that she continued to contact CPC for counseling, but without success. Rocco also asserted that when CPC finally accepted her, the interviewer said, "[O]kay, we're going to lie about this and say that you're depressed so that you can get the services that you need."

Sophie Keefe-Bullock, a Department social worker, supervised Rocco's twice weekly visits with J.J.R. and J.T.R. during most of the dependency period. For the most part, Keefe-Bullock found that Rocco's visits were appropriate. Keefe-Bullock's primary concern involved Rocco's hypervigilance about the children's health and bodies. During the visits, Rocco was frequently checking the boys for marks, small scratches, bug bites, and bruises in a way that "put the boys on edge about their own bodies." After looking at the marks, Keefe-Bullock had no concerns that the children were being harmed at their foster home.

At trial, Dr. Tutty explained how TF-CBT could help Rocco manage her PTSD:

Well, it's targeting the traumatic memories and helping the individual better manage those memories when they resurface, whether that be, you know, through dreams or through the waking state. Typically individuals with PTSD have a lot of recollections of those traumatic experiences, and as a result, avoid people, situations that remind them of those events. They maintain a—a pretty rigid hypervigilant stance, so they're very tense, anxious. They have a lot of negative emotions, negative cognitions. It's very impairing.

In preparing his evaluation, Tutty was unable to consider Rocco's participation in the MMPI-II (Minnesota Multiphasic Personality Inventory-2), a widely used personality test, because her answers indicated a "positive impression management" that led to an invalid result. Rocco's answers indicated that she was "attempting to manipulate how others view her character." Similarly, Rocco's profile for the Child Abuse Potential Inventory, which measures risk for committing future child abuse, was also invalid because of her positive impression management.

Tutty identified trust issues, Rocco's significant tension, and her displayed hypervigilance as problems that could impair her ability to engage in and complete services. Rocco told Tutty that J.J.R. received his black eyes when he fell following a seizure. Rocco explained that J.J.R. first fell backwards and injured one side of his face. After he stood up, J.J.R. then fell back down and injured the other side of his face. Based on his experience in treating both children and adults with seizure disorders, Dr. Tutty found Rocco's explanation not plausible.

Rocco requested that the termination decision be deferred for 90 days to assess whether the treatment would be effective. The court did not defer the decision.

On November 24, 2015, following a four day trial, the juvenile court entered findings of fact, conclusions of law, and an order terminating Rocco's parental rights in J.J.R. and J.T.R. The court found much of Rocco's testimony not credible, including her account of why CPC denied her requests for services and her claim that she was no longer in contact with Maynard. Rocco appeals.

ANALYSIS

Parents have fundamental liberty and privacy interests in the care and custody of their children. In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995); Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). When determining whether to terminate parental rights, Washington courts follow a two-step process. First, the Department must prove the following six statutory requirements by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

-11-

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1); see also In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010); RCW 13.34.190.

Second, if the Department proves the six termination factors, the court then determines, by a preponderance of the evidence, if termination is in the child's best interests. RCW 13.34.190(1)(b).

Where, as here, the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the declared premise." In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Clear, cogent, and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

I.   All Necessary and Available Services

Rocco contends that the Department failed to prove it offered or provided her with all necessary services capable of correcting her parental deficiencies as required

No. 74624-3-I/13

by RCW 13.34.180(1)(d). The Department must offer services that are specifically tailored to each individual's needs. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001).

Rocco does not dispute that the Department offered or provided the necessary mental health services. She argues, however, that the Department failed to provide reasonably competent case management services from October 2014, when Dr. Tutty completed his evaluation, through February and March 2015, when social worker Melissa Hoogendoorn provided oral and written referrals for mental health services. Rocco claims that Hoogendoorn unreasonably delayed providing her with Dr. Tutty's evaluation and then failed to provide her with competent assistance in accessing the services. Rocco maintains that the 3-4 month delay hindered her access to the crucial mental health services and "derailed" her efforts to address her parental deficiencies in time for trial.

The court was clearly concerned by the Department's delay in providing Rocco with referrals following Tutty's evaluation. But the court also found

> The mother understood that she needed to consistently engage in the services offered by the Department to reunify with her children. She acknowledged during testimony at trial that she knew she needed to engage in TF-CBT and seek an evaluation for medication management. Until just before trial began, the mother did not make a reasonable attempt to engage in these recommended services. Her explanation for not enrolling in counseling earlier because she was ""denied" services was not credible. Ms. Rocco testified that, even though she told the intake assessor that she had to have counseling as a condition to getting her children back, she was told that she did not need counseling because in her intake questionnaire she denied that she had thoughts of suicide or harming others. Ms. Rocco explained when she sought counseling at CPC a second time, shortly before trial, that the intake

-13-

assessor told her that she was going to "lie" in order to allow Ms. Rocco to qualify for counseling services. This testimony also was not credible.

The record establishes that Hoogendoorn reviewed Tutty's recommendations and the service requirements with Rocco by telephone and in person in February and March 2015. Rocco repeatedly acknowledged that she understood the court-ordered requirements for TF-CBT and medication management and understood where to request the services. But throughout the dependency, she told social workers that she did not need therapy and, more specifically, that she would not participate in medication management. At the conclusion of the March 2015 meeting with Hoogendoorn, Rocco stormed out after insisting that she would not participate in TF-CBT.

On appeal, Rocco claims that she "acted promptly" on the Department's referral. But, Rocco's testimony about her efforts to obtain services from CPC was inconsistent and contradictory, and the court found her account not credible. An appellate court does not make credibility determinations or weigh evidence on review. In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006); see also In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999) (because the trial judge has the advantage of viewing the witnesses, deference to the court's findings is of particular importance in deprivation hearings).

Rocco apparently indicated to Hoogendoorn that she had requested services from CPC in February 2015 without providing Dr. Tutty's evaluation or explaining her diagnosis of PTSD. But, Rocco testified that she was denied services at CPC during her first intake assessment in February 2015 because she did not endorse mental

health issues, even though she shared Tutty's evaluation. Rocco claimed that she then made repeated requests for services at CPC that were denied for the same reason. When CPC finally accepted her after a second assessment in July or August 2015, Rocco stated that the intake assessor said she would lie about the diagnosis in order to provide services.

Based on its credibility assessment and the other evidence of Rocco's reluctance to participate in TF-CBT and medication management, despite her understanding of their importance, the court could reasonably conclude that Rocco effectively refused to engage in the necessary services, or failed to make serious and reasonable efforts, until shortly before trial. Cf. In re Dependency of T.R., 108 Wn. App. at 163 ("When a parent is unwilling or unable to make use of the services provided, [the Department] is not required to offer still other services that might have been helpful."). Contrary to Rocco's arguments, the court's findings, when viewed in their entirety, do not reflect a material misunderstanding of the chronology of events. Clear, cogent, and convincing evidence supports the court's determination that the Department offered or provided all necessary services capable of correcting her parental deficiencies.

II. Little Likelihood that Conditions Would be Remedied in the Near Future

Rocco contends the Department failed to prove there was little likelihood that conditions would be remedied so that the children could be returned in the near future. RCW 13.34.180(1)(e). The focus of this requirement is whether the identified deficiencies have been corrected. See In re Welfare of M.R.H., 145 Wn. App. 10, 27,

188 P.3d 510 (2008). What constitutes "near future" necessarily depends on the specific circumstances of each case, including the child's age and placement circumstances. C.B., 134 Wn. App. at 954; see also In re A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988) ("Although 1 year may not be a long time for an adult decision maker, for a young child it may seem like forever."). "A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the State has satisfied RCW 13.34.180(1)(e)." In re Welfare of T.B., 150 Wn. App. 599, 608, 209 P.3d 4975 (2019).

Rocco maintains that at the time of trial, she was engaged in mental health services and beginning to gain insight into her challenges. She also points to Dr. Tutty's testimony that 90 days would be a reasonable time in which to determine whether she was making progress in her treatment. She argues that it was fundamentally unfair for the Department to delay her referral for three months and then penalize her for not remedying parental deficiencies in the "near future."

Dr. Tutty's testimony regarding an additional amount of time to assess Rocco's progress was premised both on her participation in the TF-CBT and willingness to see a medication provider. At the time of trial, Rocco had participated in one session of TF-CBT. And, although Rocco indicated she was now willing to participate in a medication assessment, her therapist testified that she was currently "not interested" in medication management.

Moreover, the evidence was undisputed that Rocco would likely need at least 9 to 12 months to complete TF-CBT, with the safety planning module not occurring

until the end of the program. The Department witnesses testified that Rocco had shown no improvement and that her mental health issues continued to negatively affect her ability to care for J.J.R. and J.T.R.

The children's CASA, Jessica Blanche, testified that given the fact that J.J.R. and J.T.R., had already been in foster care for two years, any additional delay would be detrimental. Blanche acknowledged that a deferral of the termination decision for no more than 90 days would not be "extremely detrimental," but she believed that any further delay would be emotionally detrimental to the children. Blanche strongly questioned Rocco's motivation for her late participation in court ordered treatment and her ability to utilize those services to improve her parenting deficiencies. As late as August 21, 2015, Rocco told Blanche that she had tried to go to counseling but was denied. Rocco also told Blanche that she did not need counseling or mental health treatment of any kind.

Substantial evidence supports the court's determination that there was little likelihood that Rocco would correct her parental deficiencies in the near future.

III.    Continuation of the Parent-Child Relationship

Rocco contends the Department failed to establish that continuation of the parent and child relationship clearly diminished the children's prospects for early integration into a stable and permanent home. RCW 13.34.180(f). But, this contention rests solely on the assertion that the Department failed to provide all necessary services. As set forth above, the Department provided all necessary services. We therefore reject Rocco's argument.

IV.   Best Interests of the Children

Rocco contends the court erred when it determined that termination of her parental rights was in the best interests of the children. RCW 13.34.190(1)(b). As Rocco notes, it is undisputed that the children have a strong bond with her and always demonstrate warmth and affection during her visits. Rocco also relies on the testimony of Delilah Bruskas, a legal nurse consultant. Bruskas testified that termination of the attachment between a child and primary caregiver "is going to be potentially developmentally destructive because all subsequent developmental stages of childhood are built upon that."

Whether termination of parental rights is in the best interest of the child is a fact specific inquiry. In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). The record here clearly demonstrates that Rocco loves and cares for her children, and that they have a strong attachment to her. But "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020.

At the time of trial, J.J.R. and J.T.R. had been in foster care for two years. Because of her untreated mental health issues, Rocco was unable to provide a safe home for them in the near future. Although she had just participated in the first session of the court ordered TF-CBT, Rocco had not yet even scheduled the required medication assessment. The Department's witnesses testified that after two years in foster care, J.J.R. and J.T.R. needed stability and permanency. Because Rocco's

therapy was going to take 9 to 12 months and the outlook for success was unclear, the out children faced the " 'limbo of foster care for an indefinite period.' " T.R., 108 Wn. App. at 167 (quoting A.W., 53 Wn. App. at 33). Substantial evidence established that termination was in the best interests of the children.

V.    Due Process

Rocco challenges the following finding of fact:

> Ms. Rocco does not appear to have a support system in place to assist her with parenting or with her mental health challenges. She has described her own mother as "controlling" and 'vindictive" - as someone who has repeatedly contacted Ms. Rocco's neighbors and Ms. Rocco's landlord to "spread lies" about the mother. The only testimony Ms. Rocco offered about a support system was that she reads her bible when she feels depressed and she will call up a friend and they will read the bible to each other over the phone.

Rocco contends that she was never notified that a failure to have a support system constituted a parental deficiency that could justify termination of her parental rights. She argues that the juvenile court's reliance on this alleged parental deficiency therefore violated her due process rights. In re Dependency of A.M.M., 182 Wn. App. 776, 779, 332 P.3d 500 (2014) (termination order relying on parental deficiency not identified in the dependency or termination petitions violated due process).

The challenged finding is one of 13 that the court entered in support of its determination that there was little likelihood that the conditions resulting in dependency would be remedied in the near future. The finding accurately summarized Rocco's testimony. Among other things, Rocco characterized her

-19-

mother as "controlling and vindictive" and accused her of spreading lies to CPS and abusing J.J.R. and J.T.R.

Viewed in their entirety, the findings establish that court relied solely on Rocco's failure to remedy her untreated mental health issues as the parental deficiency warranting termination. Rocco does not identify anything in the record or the parties' arguments suggesting that lack of a support system was a parental deficiency that she needed to correct. The court's reliance on this circumstance as one of many reasons for determining that Rocco would be unable to remedy her mental health issues in the near future did not identify an additional parental deficiency requiring separate notice. Rocco fails to demonstrate a due process violation.

Affirmed.

WE CONCUR: